# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

HEATHER LYNN IRWIN,        )
                           )
      Plaintiff,          )
                           )
v.                         )      CAUSE NO. 1:17-cv-00408-SLC
                           )
COMMISSIONER OF SOCIAL     )
SECURITY, *sued as Nancy A. Berryhill,* )
*Acting Commissioner of Social Security* )
*Administration,*               )
                           )
      Defendant.       )

## OPINION AND ORDER

Plaintiff Heather Lynn Irwin appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying her application under the Social

Security Act (the "Act") for disability insurance benefits ("DIB").[1]  (DE 1).  Irwin filed her

opening brief on May 25, 2018, and the Commissioner filed her response on August 1, 2018.

(DE 18; DE 21).  Irwin has not filed a reply brief, and her time to do so has now passed.  N.D.

Ind. L.R. 7-1(d)(2)(B).  Therefore, the matter is ripe for ruling.

For the following reasons, the Commissioner's decision will be AFFIRMED.

## I.  FACTUAL AND PROCEDURAL HISTORY

Irwin applied for DIB in August 2014, alleging disability as of August 15, 2000.  (DE 9

Administrative Record ("AR") 400-01).  The Commissioner denied Irwin's application initially

and upon reconsideration.  (AR 308, 319).  After a timely request, a hearing was held on July 7,

2016, before Administrative Law Judge William Pierson (the "ALJ"), at which Irwin, who was

---

[1] All parties have consented to the Magistrate Judge.  (DE 13); *see* 28 U.S.C. § 636(c).

represented by counsel, and Amy Kutschbach, a vocational expert (the "VE"), testified. (AR 247-307). On September 28, 2016, the ALJ rendered an unfavorable decision to Irwin, concluding that she was not disabled because despite the limitations caused by her impairments, she could perform a significant number of unskilled, light exertional jobs in the economy. (AR 11-33). Irwin's request for review was denied by the Appeals Council (AR 1-4), at which point the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. § 404.981.

Irwin filed a complaint with this Court on September 20, 2017, seeking relief from the Commissioner's decision. (DE 1). In the appeal, Irwin alleges that: (1) the ALJ failed to adequately account for all of Irwin's severe and non-severe impairments when assessing her residual functional capacity ("RFC"); (2) the ALJ overemphasized Irwin's daily living activities when considering her symptom testimony; and (3) the ALJ's step-five finding is not supported by substantial evidence because the VE purportedly lacked a proper foundation for her testimony concerning the number of representative jobs in the economy. (DE 18 at 2).

At the time of the ALJ's decision, Irwin was 44 years old (AR 400), had a high school education (AR 32), and had work experience as a teacher's aide, a character impersonator, a retail sales clerk, a fast food worker, a store laborer, a general ledger accountant, and a groundskeeper (AR 505). In her DIB application, Irwin alleges disability due to: depression, attention deficit hyperactivity disorder (ADHD), a cervical spine injury from an auto accident, a hyper-extended thumb, hepatitis B, and high cholesterol. (AR 450).

## II. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the

[Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citation omitted).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted). "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

### III. ANALYSIS

#### *A. The Law*

Under the Act, a claimant is entitled to DIB if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C.

§ 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App'x 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[2] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted); 20 C.F.R. § 404.1520. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (citation omitted). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* (citation omitted). The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868 (citation omitted).

### B. The Commissioner's Final Decision

On September 28, 2016, the ALJ issued a decision that ultimately became the Commissioner's final decision. (AR 11-33). At step one, the ALJ found that Irwin had engaged in substantial gainful activity after her alleged onset date during 2011, 2012, and the second quarter of 2014, as well as perhaps during the school year of 2013. (AR 13-14). The ALJ acknowledged, however, that there had been continuous 12-month periods during which Irwin

---

[2] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

did not engage in substantial gainful activity. (AR 14). Accordingly, the ALJ proceeded to step two. (AR 14).

At step two, the ALJ found that Irwin had the following severe impairments: degenerative disc disease, depression, ADHD, anxiety, and a history of post traumatic stress disorder ("PTSD") and borderline personality traits. (AR 14). At step three, the ALJ concluded that Irwin did not have an impairment or combination of impairments severe enough to meet or equal a listing. (AR 20).

Before proceeding to step four, the ALJ determined that Irwin's symptom testimony was not entirely consistent with the medical evidence and other evidence of record. (AR 25). The ALJ then assigned Irwin the following RFC:

> [T]he claimant has the [RFC] to perform light work . . . except: The claimant is limited to lifting, carrying, pushing, and pulling ten pounds frequently and 20 pounds occasionally. The claimant can sit at least six hours in an eight-hour workday and stand and/or walk six hours in an eight-hour workday. The claimant can occasionally kneel, crouch, and crawl. The claimant can occasionally balance. The claimant can occasionally bend and stoop in addition to what is required to sit. The claimant can occasionally use ramps and stairs. The claimant is limited to work that involves only simple, routine, and repetitive tasks that can be learned through short demonstration and up to 30 days. The claimant can maintain the concentration required to perform simple tasks. The claimant can remember simple work-like procedures. The claimant can make simple work-related decisions. The claimant can maintain the concentration and attention as well as the persistence to perform such duties on a day-in and day-out basis, for eight hours per day, five days per week, or within some other form of fulltime competitive work environment. The work involves reasoning levels 1, 2, and 3, as defined within the Dictionary of Occupational Titles, and SVP levels of 1 and 2, as rated by the SCO. The claimant is []limited to superficial interaction with coworkers, supervisors, and the public, with superficial interaction defined as occasional and casual contact not involving prolonged conversation. Contact with supervisors still

involves necessary instruction. Prolonged conversation is not necessary for task completion. The claimant is limited to work within a low stress job defined as requiring only occasional decision-making and only occasional changes in the work setting. The claimant can tolerate predictable changes in the work environment. The claimant can meet production requirements in an environment that allows her to sustain a flexible and goal-oriented pace. The claimant is limited from fast-paced work, such as assembly line production work with rigid or strict productivity requirements.

(AR 22-23). Based on the assigned RFC and the VE's testimony, the ALJ found at step four that Irwin was unable to perform any of her past relevant work. (AR 31). However, the ALJ found at step five that Irwin could perform a significant number of unskilled, light jobs in the economy, including repack room worker, stock checker, office helper, and garment sorter. (AR 32). Therefore, Irwin's application for DIB was denied. (AR 33).

### C. The Assigned RFC

To begin, Irwin challenges the RFC assigned by the ALJ (and the hypothetical posed to the VE based on the RFC),[3] asserting that it does not adequately account for her severe and non-severe impairments—in particular, her moderate deficits in maintaining concentration, persistence, or pace; her upper extremity problems; and her "sit and stand ability." (DE 18 at 14-15). Contrary to Irwin's assertions, the assigned RFC is supported by substantial evidence.

The RFC is a determination of the tasks a claimant can do despite her limitations. 20 C.F.R. § 404.1545(a)(1). In determining the RFC, the ALJ "must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." SSR 96-8p, 1996 WL 374184, at *5 (July 2,

---

[3] The hypothetical posed to the VE incorporated all of the limitations set forth in the RFC (*compare* AR 22-23, *with* AR 298-99), and thus, the Court will simply refer to the RFC for purposes of this argument.

1996). In doing so, the ALJ "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe'[,]" because they "may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim." *Id*. Although an ALJ may decide to adopt the opinions in a medical source statement concerning the ability of a claimant to perform work-related activities, the RFC assessment is an issue reserved to the ALJ. SSR 96-5p, 1996 WL 374183, at *4 (July 2, 1996). When assigning the RFC, the ALJ must sufficiently explain his reasoning to build an "accurate and logical bridge" between the evidence of record and the RFC. *Craft v. Astrue*, 539 F.3d 668, 673, 677 (7th Cir. 2008).

      1.     <u>Moderate Deficits in Concentration, Persistence, or Pace</u>

Irwin first argues that the assigned RFC does not adequately account for her moderate deficits in concentration, persistence, or pace, asserting that the ALJ "placed virtually no pace or persistence limitations in the RFC." (DE 18 at 14). Irwin's argument is without merit.

At steps two and three of the sequential evaluation, the ALJ determines the severity of a claimant's mental impairment by assessing her degree of functional limitation in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings. SSR 96-8p, 1996 WL 374184, at *4. Relevant to this appeal, the "paragraph B" criteria consist of four "broad functional areas": activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3); *see, e.g.*, *Jones v. Massanari*, No. 01-C-0024-C, 2001 WL 34382025, at *13 (W.D. Wis. Oct. 18, 2001). "[T]he limitations identified in the 'paragraph B' criteria and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the

sequential evaluation process."  SSR 96-8p, 1996 WL 374184, at *4.

"The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C . . . ."  *Id*.; *see Virden v. Astrue*, No. 11-0189-DRH-CJP, 2011 WL 5877233, at *9 (S.D. Ind. Nov. 4, 2011) ("The B criteria are relevant to determining whether the claimant meets or equals a listed impairment.  However, the B criteria re not an assessment of RFC.").  "RFC is what an individual can still do despite his or her limitations." SSR 96-8p, 1996 WL 374184, at *2; *see* 20 C.F.R. § 404.1545(a)(1).  "The RFC assessment must be based on *all* of the relevant evidence in the case record . . . ."  SSR 96-8p, 1996 WL 374184, at *5; *see* 20 C.F.R. § 404.1545(a)(3).  That is, "[i]n assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96-8p, 1996 WL 374184, at *5; *see Paar v. Astrue*, No. 09 C 5169, 2012 WL 123596, at *13 (N.D. Ill. Jan. 17, 2012).

Here, when assessing the "paragraph B" criteria at steps two and three, the ALJ concluded that Irwin had moderate difficulties in maintaining concentration, persistence, or pace. (AR 21-22).  When proceeding to step four, the ALJ assigned Irwin the following mental RFC, in relevant part:

> The claimant is limited to work that involves only simple, routine, and repetitive tasks that can be learned through short demonstration and up to 30 days.  The claimant can maintain the concentration required to perform simple tasks. . . .  The claimant can maintain the concentration and attention as well as the persistence to perform such duties on a day-in and day-out basis, for eight hours per day, five days per week, or within some other form of fulltime competitive work environment. . . .  The claimant is limited to work within a low stress job defined as requiring only occasional decision-making and only occasional changes in the

work setting. . . .  The claimant can meet production requirements in an environment that allows her to sustain a flexible and goal-oriented pace.  The claimant is limited from fast-paced work, such as assembly line production work with rigid or strict productivity requirements.

(AR 22-23).

Irwin asserts that the foregoing restriction is inadequate because it did not expressly include the ALJ's finding at step two that she had moderate difficulties in maintaining concentration, persistence, or pace.  Irwin argues that in most cases, incorporating terms like "simple, repetitive tasks" or "unskilled work" on their own will not necessarily exclude from the VE's consideration those jobs that present significant problems of concentration, persistence, or pace.

The Seventh Circuit Court of Appeals has instructed that "for most cases, the ALJ should refer expressly to limitations on concentration, persistence, and pace in the hypothetical in order to focus the VE's attention on these limitations and assure reviewing courts that the VE's testimony constitutes substantial evidence of the jobs a claimant can do."  *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620-21 (7th Cir. 2010) ("Our cases, taken together, suggest that the most effective way to ensure that the VE is apprised fully of the claimant's limitations is to include all of them directly in the hypothetical.").  Having said that, the Seventh Circuit has not insisted "on a per se requirement that this specific terminology ('concentration, persistence and pace') be used in the hypothetical in all cases."  *Id.* at 619.  The court explained:

We also have let stand an ALJ's hypothetical omitting the terms 'concentration, persistence and pace' when it was manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform.  We most often have done so when a claimant's limitations were stress- or panic-related and the hypothetical

restricted the claimant to low-stress work.

*Id.* (citing *Arnold v. Barnhart*, 473 F.3d 816, 820 (7th Cir. 2007) (upholding a hypothetical restricting the claimant to work involving low production standards and a low-stress environment, where the claimant's difficulties with concentration, persistence, or pace arose from stress-induced headaches, frustration, and anger); *Johansen v. Barnhart*, 314 F.3d 283, 288-89 (7th Cir. 2002) (allowing a hypothetical formulated in terms of "repetitive, low-stress" work to stand, where the claimant's deficits in concentration, persistence, or pace stemmed from a panic disorder); *Sims v. Barnhart*, 309 F.3d 424, 427, 431-32 (7th Cir. 2002) (finding that the ALJ's restricting the claimant from jobs "involving complex work processes or unusual levels of stress" adequately accommodated the claimant's concentration problems arising, in part, from a panic disorder)).

   "In most cases, however, employing terms like 'simple, repetitive tasks' on their own will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace." *Id.* at 620 (finding that a restriction to repetitive tasks with simple instructions did not necessarily account for the claimant's depression-related problems in concentration, persistence, and pace) (collecting cases); *see also Warren v. Colvin*, 565 F. App'x 540, 544 (7th Cir. 2014) (finding that a limitation to "simple, repetitive tasks" did not adequately account for the claimant's concentration problems arising from depression and borderline intellectual functioning); *Yurt v. Colvin*, 758 F.3d 850, 859 (7th Cir. 2014) (concluding that a limitation to unskilled work did not sufficiently account for the claimant's concentration problems stemming from depression and a psychotic disorder). "The ability to stick with a given task over a sustained period is not the same as the ability to learn

how to do tasks of a given complexity." *O'Connor-Spinner*, 627 F.3d at 620 (citing *Stewart v. Astrue*, 561 F.3d 679, 684-85 (7th Cir. 2009); *Craft*, 539 F.3d at 677; *Kasarsky v. Barnhart*, 335 F.3d 539, 544 (7th Cir. 2003); SSR 85-15, 1985 WL 56857, at *6 (Jan. 1, 1985)).

"Because response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job." SSR 85-15, 1985 WL 56857, at *6. "A claimant's [mental] condition may make performance of an unskilled job as difficult as an objectively more demanding job." *Id*. Accordingly, the RFC and hypotheticals "must account for *both* the complexity of the tasks and the claimant's ability to stick with a task over a sustained period." *Warren*, 565 F. App'x at 544 (emphasis added) (citations omitted); *see Yurt*, 758 F.3d at 858 (articulating that an RFC for unskilled work "by itself does not provide any information about [the claimant's] mental condition or abilities").

Here, the ALJ crafted an RFC that addressed both the complexity of the tasks that Irwin could perform and her ability to complete such tasks over a sustained period. To address complexity, the ALJ limited Irwin to "work that involves only simple, routine, and repetitive tasks that can be learned through short demonstration and up to 30 days." (AR 22). To address the ability to stick with a given task over a sustained period, the ALJ articulated that Irwin "can maintain the concentration required to perform simple tasks"; "can maintain the concentration and attention as well as the persistence to perform such duties on a day-in and day-out basis, of eight hours per day, five days per week, or within some other form of fulltime competitive work environment"; and "can meet production requirements in an environment that allows her to sustain a flexible and goal-oriented pace." (AR 22-23). Additionally, the ALJ limited Irwin to

11

work in a "low-stress job" and precluded her from "fast-paced work, such as assembly line production work with rigid or strict productivity requirements." (AR 23). Thus, the ALJ did not run afoul of the Seventh Circuit's instruction in *O'Connor-Spinner* to address both the complexity of the tasks the claimant can perform and the claimant's ability to stick with the tasks over a sustained period. 627 F.3d at 620.

"[T]he RFC determination is one firmly within the ALJ's discretion to determine, so long as [she] sufficiently articulates [her] reasoning and the record adequately supports [her] conclusion." *Terry v. Astrue*, No. 3:09-CV-503 JD, 2011 WL 855346, at *17 (N.D. Ind. Mar. 7, 2011) (citing 20 C.F.R. §§ 404.1546(c), 404.1527(e)(2) and collecting cases). Here, the ALJ considered Irwin's concentration, persistence, and pace problems not only at step three, but also when assigning the RFC. (AR 38, 46). The ALJ concluded that while Irwin had moderate deficits in concentration, persistence, or pace for purposes of step three, she still had adequate attention, concentration, and persistence to sustain the performance of simple, routine, and repetitive tasks throughout an eight-hour workday, five days a week. *See, e.g.*, *Elliott v. Berryhill*, No. 1:16-cv-309-WTL-DML, 2017 WL 3613671, at *2-3 (S.D. Ind. Aug. 23, 2017) (finding that the ALJ avoided the *O'Connor-Spinner* error by explaining that the claimant's ability to concentrate was higher when limited to simple and repetitive tasks). The ALJ incorporated other restrictions into Irwin's RFC as well, including a limitation to a "low stress job" with "only occasional decision-making" and "only occasional changes in the work setting." (AR 23). The ALJ also incorporated various restrictions designed to account for Irwin's difficulties in maintaining social functioning. (AR 23).

As such, Irwin's assertion that the ALJ "placed virtually no pace or persistence

limitations in the RFC" mischaracterizes the ALJ's decision.  (DE 18 at 14).  The mental restrictions in the RFC, taken together, adequately account for Irwin's credible concentration, persistence, and pace limitations.  *See Cihlar v. Berryhill*, 706 F. App'x 881, 882 (7th Cir. 2017) (concluding that the ALJ's hypotheticals to the VE "adequate account[ed] for Cihlar's credible concentration and persistence limitations" even though "the ALJ did not use the magic words 'concentration' or 'persistence'").  Therefore, Irwin's first challenge to the assigned RFC is unpersuasive.

       2.    <u>Upper Extremity Problems</u>

Irwin also contends that the RFC is flawed because it fails to account for her "documented unresolved problems in both hands."  (DE 18 at 14).  This argument, too, fails to warrant a remand of the assigned RFC.

At the hearing, Irwin testified that she had a bone spur removed from her left wrist, and that the surgery had relieved her prior complaints of pain.  (AR 278-79).  She cited no other problems with her left hand, other than when typing she sometimes has difficulty moving her little finger to the shift key, which she claimed was a result of her wrist surgery.  (AR 279).  As to her right hand, Irwin stated that she had "hyper-extended" her thumb on two occasions; she elaborated that she does not have any current pain from these hyper-extensions, but her right thumb "doesn't go as far as the other one."  (AR 278-79).  She claimed that, consequently, she cannot hold a paintbrush or write for very long, and sometimes she cannot use a manual can opener.  (AR 280).

The ALJ expressly considered Irwin's testimony that she cannot hold a pencil or paintbrush for long and that she sometimes needs assistance to open jars.  (AR 16).  The ALJ

noted, however, that at a consultative examination in November 2014, Irwin's grip strength was normal on the left and only slightly diminished on the right, and her fine and gross dexterity were normal. (AR 27, 553, 815). The ALJ also considered that Irwin had tiled her kitchen and living room floors herself in 2014, which he found inconsistent with limiting and disabling physical impairments. (AR 15).

The ALJ also cataloged the treatment that Irwin had received for any upper extremity complaints. As to her thumb complaints, in early 2005 Irwin consulted Dr. C. LaSalle, but X-rays of her right thumb were normal; he recommended that she work on her range of motion and strengthening in a therapy program. (AR 16, 844-46). Irwin, however, did not return for further treatment. (AR 16). Two years later, in 2007, Irwin went to Dr. LaSalle for complaints of *left* thumb pain, stating that she had hyper-extended it a few times. (AR 16, 839-40). An examination showed ecchymosis and some tenderness in the metacarpophalangeal joints, but her ligaments were "quite stable" and her sensation was normal. (AR 16, 839-40). X-rays were also normal, and Dr. LaSalle diagnosed her with a sprain, prescribed a thumb splint, and placed her on restricted duties for four weeks. (AR 16, 839-40). Irwin again failed to attend a follow-up appointment. (AR 16). Six years later, in April 2013, Irwin saw Dr. N. Cook, stating that she had hyper-extended her right thumb while moving furniture. (AR 16, 745-50). An examination showed reduced range of motion in her thumb, but normal strength. (AR 16, 745-50). X-rays were normal, but an MRI confirmed a sprain. (AR 16, 745-50). Irwin was advised to wear a splint for four weeks. (AR 16, 745-50).

The ALJ pointed out that there was no other treatment of record for Irwin's complaints of right thumb pain or restrictions. (AR 16). In fact, when Irwin was seen in March 2015 for left

14

wrist pain, an examination of each hand was normal, including grip strength and stability. (AR 16, 809-12). In July 2016, an examination by Dr. Steven Eddy revealed full range of motion of her right upper extremity and that she could perform all "cardinal movements" with her right hand. (AR 25, 1169-70). Given this evidence, and the lack of any other records to support Irwin's complaints, the ALJ concluded, and appropriately so, that the medical evidence was inconsistent with Irwin's complaint of a limiting right thumb impairment. (AR 16).

The ALJ also cataloged the medical evidence of record concerning Irwin's complaint that her left small finger had limited motion as a result of her left wrist surgery. (AR 16-17). Specifically, Irwin stated that she sometimes cannot reach the shift key with her little finger when typing. (AR 16-17). But the ALJ considered that by December 2015, five weeks after her surgery, records show that Irwin was doing well, had full wrist range of motion, and moved all of her fingers "completely." (AR 17, 686).

The ALJ further considered that more recently, in March 2016, Irwin reported a two-year history of left hand and forearm numbness and an inability to move her fingers after each "episode." (AR 17, 699-702). An examination revealed intact sensation, and she was diagnosed with cubital tunnel syndrome. (AR 17, 699-702). The doctor advised her to take Ibuprofen, avoid compression of her elbow, and to return if her symptoms did not resolve. (AR 17, 699-702). There is no evidence that she received any further treatment for her complaints.

The ALJ found that this medical evidence and Irwin's daily activities were inconsistent with Irwin's claim of hand limitations, including an inability to blow dry her hair. (AR 24-25). Furthermore, the state agency physician, Dr. M. Ruiz, opined in December 2014 that Irwin had no manipulative limitations, and another state agency physician, Dr. M. Brill, opined the same in

January 2015.  (AR 27, 315, 326).  Considering the minimal objective medical evidence pertaining to Irwin's claim of limiting upper extremity problems, the conservative treatment that Irwin received for upper extremity problems, Irwin's daily activities (which, as described *infra*, included regularly running an eBay store and uploading photographs, tiling floors, landscaping, and staining a fence), and the medical source opinions, the ALJ's rationale for choosing not to incorporate any upper extremity limitations in the RFC is easily traceable and amply supported. *See Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996) (stating that an ALJ must sufficiently articulate his assessment of the evidence to assure that the important evidence has been considered and that the ALJ's path of reasoning can be traced).  Accordingly, Irwin's assertion of error with respect to the RFC and her "documented unresolved problems in both hands" is unpersuasive.  (DE 18 at 14).

    3.    <u>Ability to Sit and Stand</u>

Irwin also argues that she has greater limitations in sitting and standing than included in the RFC.  To review, the ALJ concluded when assigning the RFC that in an eight-hour workday, Irwin could sit for six hours and stand or walk for six hours.  (AR 22).

Irwin advances this argument concerning her sitting and standing ability in one sentence, referring vaguely to her "many unresolved physical and other problems covered above and in the statement of facts."  (DE 18 at 15).  Because Irwin failed to develop this argument, she has waived it.  *See, e.g.*, *Webster v. Astrue*, 580 F. Supp. 2d 785, 794 (W.D. Wis. 2008) (explaining in a social security appeal that undeveloped arguments are deemed waived (citing *Kochert v. Adagen Med. Int'l, Inc.*, 491 F.3d 674, 679 (7th Cir. 2007))).

Moreover, even if Irwin had not waived it, this argument is without merit.  The ALJ

provided a thorough summary of Irwin's physical examinations, which generally consisted of conservative treatment for various injuries or conditions and mild complaints of a chronic nature. (AR 14-31). For example, in early 2000, Irwin complained of a tailbone injury and right hip pain, but an examination revealed no tenderness, full range of motion, and negative straight leg raise tests. (AR 19, 865). In 2005, Dr. J. Harris noted in January 2005 that Irwin's right hip had full range of motion with only slight pain on internal rotation, and there were no signs of arthritis in her hips. (AR 19, 848-49). In 2014, Irwin reported knee pain after tiling her kitchen and living room floors, but an examination revealed a normal gait and no significant reduction in range of motion; X-rays were unremarkable, and she was diagnosed with tendonitis. (AR 15, 692-93). Also in 2014, Irwin reported back pain after landscaping, digging up mulch, and staining her fence; she was diagnosed with a muscle spasm and instructed to take medication as needed. (AR 26, 570-72).

In November 2014, Irwin was examined by Dr. H.M. Bacchus, and Irwin reported that she could sit indefinitely and stand or walk for 90 to 120 minutes. (AR 27, 552-54). On examination, Irwin's gait was steady and sustainable, though slightly slow; she could walk on her heels, toes, and in tandem. (AR 27, 553). Dr. Bacchus opined that Irwin could perform "light to moderate, general type work duties." (AR 554; *see* AR 27). Similarly, the state agency physicians, Dr. Ruiz and Dr. Brill, concluded that Irwin could perform light work, which requires sitting for six hours in an eight-hour workday, or standing or walking for six hours in an eight-hour workday. (AR 27, 314, 325).

In April 2015, Irwin reported low back pain (rated as a two on a 10-point scale) of recent onset after a bus trip to Washington, D.C. (AR 26, 803-05). Rest reduced her pain, and activity

worsened it.  (AR 803).  She had limited back range of motion but a normal gait and a negative straight leg raise test.  (AR 26, 804).  Two months later, Irwin denied any muscle or joint pain. (AR 21, 27, 1040, 1086, 1176).  In August 2016, a physical therapist noted that Irwin had no limitations in walking and mild limits on sitting.  (AR 25, 1159-60).  That same month, Dr. Michael Arata observed that Irwin had good flexibility in her lumbar spine, painless motion of both hips, and good motor strength in her lower extremities.  (AR 1163-64).  An MRI of her lower back revealed a small annular tear with a tiny disc protrusion, but was otherwise unremarkable.  (AR 26, 1163-64, 1187).

The ALJ—after considering the foregoing medical evidence, Irwin's various daily activities, the conservative treatment she had undergone, and the medical source opinions—reasonably determined that Irwin had the ability to perform light work with occasional postural movements.  *See* SSR 96-5p, 1996 WL 374183, at *4 (stating that the RFC assessment is an issue reserved to the ALJ).  This RFC is consistent with the opinions of Dr. Bacchus, Dr. Ruiz, and Dr. Brill.  Irwin does not point to any medical source of record who assigned her more restrictive sitting and standing limitations than those in the RFC.  "[I]t is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove [her] claim of disability."  *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (citing 20 C.F.R. § 404.1512(c); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987)); *see Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004) ("[T]he primary responsibility for producing medical evidence demonstrating the severity of impairments remains with the claimant." (citation omitted)).  Here, Irwin has failed to carry her burden.  The RFC assigned by the ALJ is supported by substantial evidence and will be affirmed.

### D. Consideration of Irwin's Daily Activities

Next, Irwin challenges the ALJ's consideration of her daily activities when assessing her symptom testimony.[4]  In Irwin's rather melodramatic words, the ALJ allegedly erred by "overemphasizing daily activities of this recently divorced single mom who lives in an at least a residually upper-middle class world" and by portraying her as a "privileged (ex)housewife." (DE 18 at 15-19).  Contrary to Irwin's bald assertion, the ALJ fairly considered Irwin's daily activities.

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference.  *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).  If an ALJ's determination is grounded in the record and he articulates her analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988) (citation omitted), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006) (citation omitted), his determination will be upheld unless it is "patently wrong," *Powers*, 207 F.3d at 435; *see Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness . . ." (citation omitted)); *see Lemerande v. Berryhill*, No. 17- C-190, 2018 WL 1061462, at *3 (E.D. Wis. Feb. 26, 2018) ("Whether or not the SSA chooses to use the word 'credibility,' statements by the claimant concerning the intensity, persistence and limiting effects of his or her impairments that are inconsistent with the medical and other evidence in the record need not be accepted by the ALJ in reaching a decision.").

---

[4] Irwin does not challenge the ALJ's reasoning in any other respect in connection with the credibility of her symptom testimony (*see* DE 18 at 15-20), and thus, she has waived any other challenge to the ALJ's consideration of her symptom testimony.  *See, e.g., Rogers v. Barnhart*, 446 F. Supp. 2d 828, 851 (N.D. Ill. 2006) (failure to raise an issue in an opening brief constitutes waiver).

Here, the ALJ considered Irwin's part-time work activities after her alleged onset date as a factor in his assessment of her symptom testimony. The following excerpts from the ALJ's decision reflect the ALJ's thorough consideration of Irwin's part-time work activities:

> In activities of daily living, the claimant has mild restriction. The claimant worked as a teacher's aide and substitute teacher at various schools from 2009 through 2014, and earnings records reflect other part-time work throughout the period since 2000. The claimant testified that self-employment income in 2011 was related to landscaping work she performed, and that more recent self-employment income is from sales on eBay. Records of treatment at Bowen reflect that the claimant has maintained an eBay "store," and during a visit on January 18, 2016, the claimant reported that she shopped at Goodwill and "other places" to find "good deals" on things that she then sold through eBay. During her most recent medication visit on June 28, 2016, the claimant reported that she had taken nine days off of her eBay store because she had not had a vacation from the store in one year. However, she noted that she was spending a lot of time uploading photographs for sale, and that she had 200 "followers" with regard to these services. Such activities indicate significant persistence, significant concentration and focus and motivation, and appear inconsistent with alleged disability.

(AR 20-21 (internal citations omitted)).

> Some of the statements made [by the claimant] during [counseling] sessions are noteworthy in terms of the claimant's reasons for not working. On February 8, 2015, the claimant related that she was "doing a lot" on eBay, but that "I can't do anything else because I have to run my boys around a lot." She reported being tired frequently due to being a "busy mom." At follow-up on June 24, 2015, the claimant reported that her boys' counselor had advised her that she could not work "because of my youngest," and that the counselor had written a letter indicating that the claimant could not work (this letter is not in evidence). The claimant related that she was trying to get full custody of her sons, and that she was stressed over court and financial issues. . . .
>
> On December 17, 2015, the claimant related that she did not have time to work because of "having to take the kids to school and pick them" up. . . .

> . . . The claimant reported not having time for her friends (she
> confirmed that she made time for her best friend), but that she
> enjoyed her job on eBay. The claimant related that this required
> her to shop at Goodwill and "such places for good deals." The
> claimant also indicated that she was not attending church "due to
> her busy schedule," and she related that she had "never put a
> career before" her sons. . . .

(AR 29).

> [R]ecords reflect that the claimant has remained quite active,
> caring for her sons, running an eBay store and having garage sales
> (both of which require the claimant to shop for low cost items),
> and most recently uploading photographs for sale and making
> albums for others online. The claimant has been quite resourceful
> in findings ways to earn income. The claimant has related being
> unable to work due to her responsibilities as a single parent. While
> the claimant's focus on her children is commendable, having
> childcare responsibilities is not a compensable impairment under
> the Regulations.

(AR 30).

> [T]he claimant has been very active with her in-home businesses
> and raising her sons, and she has worked at, or just below,
> substantial gainful activity levels in multiple years since her
> alleged onset date of August 15, 2000.

(AR 31).

Irwin argues that the ALJ "overemphasized" Irwin's part-time work when assessing her

symptom testimony, and improperly equated her daily activities with an ability to work full time.

But Irwin's argument is baseless. An ALJ is entitled to consider a claimant's daily living

activities as a factor when assessing her symptom testimony. *See Schmidt*, 395 F.3d at 746-47

(considering claimant's performance of daily activities as a factor when discounting claimant's

credibility); 20 C.F.R. § 404.1529(c)(3); SSR 16-3p, 2017 WL 5180304, at *7 (Oct. 25, 2017).

Here, Irwin's daily activities included part-time work, and thus, the ALJ was entitled to consider

Irwin's work activities as a factor when assessing her symptom testimony. *See Berger v. Astrue*,

516 F.3d 539, 546 (7th Cir. 2008) ("Although the diminished number of hours per week indicated that Berger was not at his best, the fact that he could perform some work cuts against his claim that he was totally disabled.").

The ALJ fairly considered Irwin's part-time work activities. Irwin's argument, in part, relies on nitpicks of the record or criticisms of the ALJ's phraseology. For example, Irwin contends that the ALJ erred by stating that she performed "landscape work," rather than "landscape maintenance." (DE 18 at 15 (citing AR 20, 258)). But in reviewing an ALJ's decision, the Court must "give the opinion a commonsensical reading rather than nitpicking at it." *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) (citation omitted) (stating that the claimant's argument "amounts to nothing more than a dislike of the ALJ's phraseology"). The ALJ reasonably characterized Irwin's work in landscaping after her alleged onset date.

Irwin also asserts that the ALJ's consideration of her part-time work activities improperly portrayed her "as a privileged (ex)housewife[.]" (AR 18 at 18). However, it is Irwin, not the ALJ, who mischaracterizes the record in this respect. The ALJ never characterized Irwin in any particular way; rather, as recited above, the ALJ simply inventoried Irwin's work activities and various statements that she made to her health care providers concerning those activities.

At the end of the day, "an ALJ's credibility assessment will stand 'as long as [there is] some support in the record.'" *Berger*, 516 F.3d at 546 (alteration in original) (quoting *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)). Here, when assessing Irwin's symptom testimony, the ALJ did not overemphasize Irwin's work activities, but rather, properly cited them as one factor when building an accurate and logical bridge between the evidence of record and his conclusion about Irwin's symptom testimony, and his conclusion is not patently wrong. *See Maxwell v. Berryhill*, No. 16 C 6101, 2017 WL 4180340, at *7 (N.D. Ill. Sept. 21, 2017)

(rejecting the claimant's argument that the ALJ placed too much emphasis on her part-time work and commenting that the claimant was overstating the ALJ's findings, as the ALJ considered the claimant's part-time employment as just one factor in his credibility analysis); *Sipahimalani v. Colvin*, No. 1:12-cv-892-DKL-SEB, 2013 WL 5309898, at *7 (S.D. Ind. Sept. 23, 2013) (finding no error where the ALJ did not rely solely on the claimant's performance of part-time work in making his credibility determination and did not reject her symptoms entirely); *Bailey v. Astrue*, No. 1:09-CV-43, 2009 WL 5176156, at *13 (N.D. Ind. Dec. 21, 2009) (collecting cases). Consequently, like her first argument challenging the assigned RFC, Irwin's second argument asserting error in the ALJ's consideration of her work history is without merit. The ALJ's consideration of Irwin's symptom testimony will stand.

### E. The ALJ's Step-Five Finding Concerning the Number of Jobs

Finally, Irwin contends that the ALJ's step-five finding concerning the number of jobs is not supported by substantial evidence. Specifically, Irwin asserts that the VE testified that she essentially used an "equal distribution methodology" to move from broader Standard Occupational Classification ("SOC") categories to the narrower Dictionary of Occupational Titles ("DOT") categories to arrive at the number of jobs, and that such method has been disapproved of by the Seventh Circuit Court of Appeals. (DE 18 at 16-17). Irwin's argument, however, ultimately does not require a remand of the ALJ's step-five finding.

It is true that the Seventh Circuit has criticized the equal distribution methodology when used by a VE. In *Alaura v. Colvin*, 797 F.3d 503, 507-08 (7th Cir. 2015), the court stated:

> We have recently expressed concern with the source and validity
> of the statistics that vocational experts trot out in social
> security disability hearings, as have other courts . . . . The problem appears
> to be that the only reliable statistics are census data for broad
> categories of jobs, rather than for jobs in the narrower categories
> that the applicant for benefits is capable of doing. Typically, it

> appears, the vocational expert simply divides the number of jobs in
> the broad category that includes the narrow category of jobs that
> the applicant can perform by the number of narrow categories in
> the broad category, thus assuming that each narrow category has
> the same number of jobs as each other narrow category—which is
> preposterous. A vocational expert's stated number of jobs in a
> narrow category seems likely, therefore, to be a fabrication.

(citations and emphasis in original omitted). Nevertheless, despite this critical language of the

VE's methodology, the court did not remand the case on this basis. *Id*. at 507 (remanding due to

the ALJ's failure to consider the combined effects of the claimant's impairments on her ability to

work).

More recently, in *Chavez v. Berryhill*, 895 F.3d 962 (7th Cir. 2018), the Seventh Circuit

revisited the equal distribution methodology, again expressing its concerns about the

methodology. In that case, though, the vocational expert was pressed four times to explain why

he chose the estimates produced by the equal distribution method over those from the

JobBrowser Pro software, but the vocational expert failed to satisfactorily answer. *Id*. at 969-70.

This led the ALJ to "the conviction that the VE mechanically relied on outdated sources to

estimate job numbers, without bringing any aspect of his extensive experience to bear on the

reality of those numbers. We are left with the possibility that the job-number estimates were

'conjured out of whole cloth." *Id*. at 970 (citation and internal quotation marks omitted). The

court did not, however, enjoin the use of the equal distribution methodology *per se*, but rather

explained that something more was needed in that particular instance:

> Before accepting a VE's job-number estimate, the ALJ, when
> confronted by a claimant's challenge, must require the VE to offer
> a reasoned and principled explanation. At or after the hearing, the
> VE could support the approximation by, for example, drawing on
> knowledge of labor market conditions and occupational trends,
> gleaned from reviewing relevant data sources or from placing
> workers in jobs. . . .

> With this opinion we intend no new obligations. Substantial evidence remains the governing standard. We also recognize and underscore that VEs cannot be expected to formulate opinions with more confidence than imperfect data allows. *Nor is it our place to enjoin use of the equal distribution method.* What we do require, though, is more than what supported the ALJ's decision here.

*Id.* at 970 (emphasis added).

Here, the VE identified four representative unskilled, light-exertional jobs that a hypothetical individual of Irwin's of age, educational level, experience, and RFC could perform: repack room worker, DOT code number 920.687-146, with 300,000 jobs nationally; stock checker, DOT code number 299.667-014, with 24,000 jobs nationally; office helper, DOT code number 239.567-010, with 50,000 jobs nationally; and garment sorter, DOT code number 222.687-014, with 52,000 jobs nationally. (AR 299-300). The VE stated that her findings were consistent with the DOT. (AR 300).

Irwin's attorney asked the VE upon cross-examination about her methodology for determining the number of representative jobs, after which, the ALJ inquired as well:

> Atty   All right. On your Step 5 numbers, can you tell me how you got to the - - how you moved from the broader OES categories to the narrower [DOT] categories?
>
> VE     I start with the SOC, the Standard Occupational Classifications, and I look at the DOTs within that classification. I review them for any POPs that no longer exist . . . . Then I look for the remaining number that fit within each category that I'm considering. . . . I would count the remaining DOTs. I would multiply that by the number of DOTS in the category, take that percentage, multiply that by the national level and then again, multiply that for only the full-time positions available.
>
> Atty   Okay. And do you use any computer program to assist you in doing any of that?
>
> VE     Yes, I use SkillTRAN's Job Browser Pro.

| | |
|---|---|
| Atty | And do you know - - can you tell us the methodology - - methodological formula that SkillTRAN uses in order to process the broader numbers to the narrower DOT categories? |
| VE | I know that SkillTRAN uses surveys, employer based, and federally published surveys . . . in order to estimate their numbers.  I do not know their specific methodology, no. |
| ALJ | Do you have access?  Would they offer that to you? |
| VE | I'm sure if I call and I talk to Jeff Truthan, . . . he would tell me exactly how they would do it, yes. |
| ALJ | Or is that more of an industrial-type program that they utilize for their own benefit so that they can maintain ongoing business?  In other words, it's more of a protected program, do you know? |
| VE | No, I don't know.  Like I said, I've had conversations with Jeff Truthan, the owner of the company regarding their work.  They're very friendly. |
| ALJ | Okay. |
| VE | It's what we as rehabilitation counselors use across the board.  It's rare that any one of us uses a different program. |
| ALJ | And do you know if there's - - aside from any issues with the Social Security Administration before Federal Court, do you know if there [are] any issues out there with respect to industries that are unhappy with the program and the final results that are - - that come of it using their programs? |
| VE | Not other than the attorneys who I have in hearings, Your Honor. |
| ALJ | Okay. |

(AR 303-05).  At that point, Irwin's counsel objected to the VE's testimony as offering an

inadequate foundation for the ALJ's step-five finding, based on "the lack of provision of the

formula, but also based on her description as to how it's done."  (AR 305).  The ALJ and Irwin's

counsel then exchanged some dialogue about what Irwin's attorney thought the "proper

approach" would be, to which the attorney responded, "to conduct actual surveys of the DOT categories."  (AR 305).  The hearing then closed.  (AR 305-07).

In his decision, the ALJ overruled Irwin's objection to the number of jobs identified by the VE.  (AR 33).  In this particular instance, the Court agrees that the VE's testimony is sufficiently reliable with respect to the number of representative jobs.  The VE relied on the SOC, the DOT, and Job Browser Pro; and she identified her sources with specificity.  A portion of her sources were governmental sources of which the ALJ was required to take administrative notice.  20 C.F.R. § 404.1566(d); *see Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).  Although she could have been more artful, the VE adequately explained her methodology, which entailed starting with the SOC and DOT (publicized governmental resources), and then using Job Browser Pro (a non-governmental resource) to determine the number of specific jobs per industry, all through the lens of her own professional experience.  *See Lawrence v. Astrue*, 337 F. App'x 579, 586 (7th Cir. 2009) (finding the VE's testimony was sufficiently reliable where it was based on the DOT, the Occupational Employment Quarterly, and his own experience).  Significantly, in this instance the VE testified that Job Browser Pro is widely accepted and relied upon by vocational experts.  *Cf. Wright v. Colvin*, No. 14-cv-1113-CJP, 2015 WL 72933319, at *6 (S.D. Ill. Nov. 19, 2015) (remanding the ALJ's step-five finding where there was no testimony by the VE that Job Browser Pro was widely accepted and relied upon by vocational experts).

As explained earlier, the Seventh Circuit has recognized that the standards by which an expert's reliability is measured are generally less stringent at an administrative hearing than under the Federal Rules of Evidence.  *McKinnie v. Barnhart*, 368 F.3d 907, 910 (7th Cir. 2004); *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002).  The Seventh Circuit's reasoning in *Liskowitz*, 559 F.3d at 743-44, is particularly relevant here:

Perhaps ideally the VE would have been able to say a bit more, but this does not go without saying. The witness was testifying as a vocational expert, not as a census taker or statistician. Indeed, even if the VE had happened to know something about the statistical basis for her testimony, she arguably still would not be in a position to fully vindicate her conclusions. After all, statisticians use arithmetic operations, but few probably have studied the foundations of arithmetic in set theory. Is the statistician's use of arithmetic therefore unjustified? Clearly not. In administrative proceedings, no less than in ordinary life, "explanations come to an end somewhere."

(citation omitted).

Furthermore, Irwin's attorney never requested a copy of the data upon which the VE relied, whether at the hearing or in a letter after the hearing. *Cf. Duke v. Astrue*, No. 1:07-cv-188, 2008 WL 3992251, at *6 (N.D. Ind. Aug. 27, 2008) (finding that the data underlying the VE's bottom line testimony was not "available on demand" where claimant's attorney requested at the hearing and in a supplemental letter to review the data, but it was not produced); *Gaskill v. Astrue*, No. 1:08-cv-308, 2009 WL 3872056, at *6 (N.D. Ind. 2009) (same). Nor did Irwin supplement the record after the hearing with a post-hearing brief or contrary numbers, sources, or methodology. *See Britton v. Astrue*, 521 F.3d 799, 804 (7th Cir. 2008) (suggesting various methods that a claimant may use to challenge a VE's testimony).

Moreover, after the ALJ afforded Irwin's attorney the opportunity to cross examine the VE about her foundation, the ALJ also questioned the VE, at least to some extent, about the reliability of her conclusions. *Cf. Polly v. Astrue*, No. 1:08-cv-158, 2009 WL 1766842, at *8 (N.D. Ind. June 23, 2009) (remanding the ALJ's step five finding where the ALJ not only failed to make any inquiry into the reliability of the VE's foundation, but he affirmatively prevented claimant's counsel from doing so). As the Seventh Circuit has acknowledged, "vocational experts and administrative law judges can't be blamed for the poverty of the data concerning jobs that applicants for social security disability benefits are capable of performing." *Forsythe v.*

*Colvin*, 813 F.3d 677, 681 (7th Cir. 2016).

In sum, on the record presented, there is no indication that Irwin's challenge to the VE's methodology had any meaningful bearing on the outcome of the case. *See, e.g., Lawrence*, 337 F. App'x at 586; *Fitzgerald v. Colvin*, No. 15-cv-135-bbc, 2016 WL 447507, at *11 (W.D. Wis. Feb. 4, 2016); *Dugan v. Comm'r of Soc. Sec. Admin.*, No. 2:10-cv-231, 2011 WL 2009465, at *8 (D. Vt. May 23, 2011). As such, it would not make sense to remand this case where the record shows that the claimant is capable of performing a limited range of light exertional jobs identified by the VE. *See, e.g., Fitzgerald*, 2016 WL 447507, at *11. Consequently, the Commissioner's final decision will be affirmed.

## IV.  CONCLUSION

For the foregoing reasons, the decision of the Commissioner is AFFIRMED. The Clerk is directed to enter a judgment in favor of the Commissioner and against Irwin.

SO ORDERED.

Entered this 8th day of November 2018.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge